394 So.2d 1311 (1981)
Succession of Richard Alvin FLOOD et al.,
v.
FIDELITY & GUARANTY LIFE INSURANCE COMPANY.
No. 13904.
Court of Appeal of Louisiana, First Circuit.
January 26, 1981.
*1312 Thomas L. Wright and Edward L. Duffy, Houma, for plaintiffs and appellees.
Daniel Lund, Edward A. Rodrigue, Jr., New Orleans, for defendant and appellant.
Before COVINGTON, CHIASSON and LEAR, JJ.
LEAR, Judge.
Fidelity & Guaranty Life Insurance Company (hereinafter called Fidelity), the defendant-appellant, seeks reversal of the decision of the lower court which upheld the validity of a life insurance policy issued on the life of the late Richard Alvin Flood which, appellant contends, was fraudulently procured. The estate of decedent, Flood, instituted these proceedings to recover the proceeds of the policy of life insurance. The estate is now postured as plaintiff-appellees.
In 1971, Richard Alvin Flood resided with his wife and family in Houma, Louisiana. Mr. Flood was employed by the Transcontinental Gas Pipeline Corporation. Ellen Flood, his wife, was employed by Houtz Insurance Agency as an underwriter of personal casualty insurance.
In February, 1971, defendant, Fidelity, received an application for life insurance purportedly bearing the signature of Richard Flood. A policy of life insurance was issued, and Ellen Flood was designated as the beneficiary. In August, 1971, a change of ownership form was submitted to defendant-appellant purportedly bearing the signature of Richard Flood and changing the ownership of the policy to Ellen Flood.
Subsequent to these events, Richard Alvin Flood was murdered (in 1972) at the hands of his wife, Ellen Flood. The details of the homicide and the findings and adjudications of the guilt of Ellen Flood are found in State v. Flood, 301 So.2d 637 (La. 1974). Suffice it to say that Richard Flood was poisoned by the use of arsenic. His wife was tried for his murder and convicted in 1973.
Fidelity denied Mrs. Flood's request for payment of the insurance policy based upon her being charged with her husband's death. It returned all premiums to Mrs. Flood.
In 1977, a demand for payment of the policy was brought on behalf of the estate of Richard Flood or in the alternative for the benefit of the minor child of Richard and Ellen Flood. It was denied by Fidelity which reasoned that the policy had been obtained through the forgery and fraud of Mrs. Flood. This suit followed.
Plaintiff's evidence consisted of the certificate of death, the application and insurance policy and its demand letter. The theory of plaintiff's case was that the policy of insurance is valid because the insurer is estopped from denying coverage when, as *1313 here, its agent has signed the application purporting to witness the signature of the insured (Richard Flood).
The defendant, in an effort to prove forgery and fraud, called several witnesses. The agent, David Coignet, testified that Mrs. Flood presented him with an application which she represented was signed by her husband. Acting upon that representation, he testified that he signed his name as a witness to the signature. He further admitted that the change of ownership form, which changed ownership of the policy from Mr. Flood to Mrs. Flood, bore a signature purporting to be that of Mr. Flood which wasn't in fact witnessed by him; that all transactions concerning the policy of life insurance herein complained of were handled by Mrs. Flood.
Defendant-appellant also adduced evidence to establish the handwriting style of Mr. Flood and called as a witness Mr. Gilbert J. Portier, Jr. of New Orleans, Louisiana. Mr. Portier was qualified as an expert in handwriting identification. He testified that the known signature of Mr. Flood was not the same as the signature on the insurance policy nor that found on the change of ownership form. Finally, appellant offered without objection the opinion of the Louisiana Supreme Court, rendered in State of Louisiana v. Ellen Flood, and reported at 301 So.2d 637.
The lower court rendered judgment in favor of plaintiff in the amount of $9,000.00. In his written reasons for judgment, the trial judge concluded that it would be sheer speculation on the part of the court to conclude that Mr. Flood had no knowledge of the application and policy of insurance and did not approve and authorize the action taken by his wife in obtaining the said insurance. It further found that there was no direct provable evidence to establish the wife's motive at the time the policy was applied for and, finally, construed defendant's failure to call Mrs. Flood as a factor militating against defendant's claim.
We must decide whether or not the policy of insurance was fraudulently obtained and, if so, whether such fraud voids the contract under Louisiana law.
The case at bar involves a calculated attempt by Ellen Flood to subvert the laws of Louisiana in order to realize a pecuniary gain. Life insurance policies are procured because life is, indeed precarious and uncertain. But our law does not and cannot sanction any scheme which has as its purpose the certain infliction of death for, inter alia, financial gain through receipt of the proceeds of life insurance.
The genesis of this litigation is the escalating criminal action of Ellen Flood, bent on taking the life of her lawful husband. Our courts have previously adjudicated (1) the issue of the cause of death of Richard Flood, (2) the culprit in that death, and (3) the motives for the death.[1] Under *1314 the peculiar circumstances of the case, it was unreasonable of the trial court not to consider and to assign great weight to the mountain of circumstantial evidence tending to prove Mrs. Flood's scheme to defraud both the insurer, Fidelity, and the insured, Mr. Flood.
Louisiana follows the majority rule which holds, as a matter of public policy, that a beneficiary named in a life insurance policy is not entitled to the proceeds of the insurance if the beneficiary feloniously kills the insured. American Nat. Life Ins. Co. v. Shaddinger, 205 La. 11, 16 So.2d 889 (1944).
Article 1881 of our Civil Code[2] provides that contracts made through fraud are voidable by the parties.[3] Article 1847(7) defines, in pertinent part, fraud and an instance in which its invocation will nullify a contract.[4]
Additionally, Title 22 of the Revised Statutes, Section 619(B) governs the standard for life insurance applications:
"B. In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer."
It is clear to us that the entirety of the transaction here reviewed is tainted with the intendment of Ellen Flood to contravene the prohibitory law. The fact that plaintiff seeks to install in her stead a contingent beneficiary is of no consequence. To sanction this policy in any way would surely shackle the spirit, letter and life of our laws.
For the foregoing reasons, the decision of the lower court is reversed, and judgment is *1315 entered in favor of defendant-appellant, Fidelity & Guaranty Life Insurance Company, dismissing the suit of plaintiff-appellee, Succession of Richard Alvin Flood, all costs to be paid by the plaintiff-appellee.
REVERSED.
NOTES
[1] We have excerpted the pertinent part of the findings of the Supreme Court per Justice Marcus:

"Richard and Ellen Flood were married in 1965. At the time of Richard's death on June 2, 1972, he was about 27 years old. Richard was described as a healthy robust man about 5'-10", weighing about 190 pounds with a `fantastic build.' Defendant was described as goodlooking. Mr. Flood was employed at Transcontinental Gas Pipeline Company as a maintenance man earning an annual salary of $8,745.00. Defendant was employed at Houtz Insurance Agency as an underwriter of personal casualty insurance, with a salary of $475.00 per month. The couple lived in a house trailer. The evidence is that defendant was unhappy in marriage and was having sexual relations with other men. There is further evidence that, during April of 1972 (about two months prior to Richard's death), defendant made inquiry in regard to obtaining a $100,000.00 life insurance policy on the life of her husband. The inquiry included questions by her as to whether her husband would have to be apprised of the policy. She was given an affirmative answer to this line of questioning. The evidence reveals that thereafter no further action was taken by her in regard to the policy.
"Richard Flood had two life insurance policies. One was a group policy through his employment calculated at three times his annual base pay ($8,745.00), or about $25,000.00. The other policy was a $5,000.00 whole life type policy with a $5,000.00 declining term rider, under which policy, the beneficiary would receive approximately $9,300.00 at the time of Flood's death. The ownership of this latter policy was changed from Richard Flood to Ellen Flood on August 2, 1971. Defendant was the beneficiary under both of these policies."
* * * * * *
"Without attempting to point out the significance of the aforesaid evidence, we simply say that there is some evidence upon which the jury could reasonably conclude that defendant murdered her husband by arsenic poisoning. The motive was there. She was unhappy and going out with other men. There was some evidence that she was fearful of her husband. Further, her attempt to take out a large life insurance policy on his life without his knowledge is certainly evidence which indicates a motive, as well as the fact that she would receive about $35,000.00 as the beneficiary under the other two policies then in effect. There is also some evidence upon which the jury could conclude that she did, in fact, administer the arsenic. The evidence that six medicine bottles found in her trailer contained arsenic is revealing. This is particularly significant in view of the fact that the medicines called for by the labels on these bottles would not have contained any arsenic. Two of the medicines in these bottles, tylenol and paregoric, are the types which the jury could infer that Flood was taking for relief of headaches and diarrhea, some of the symptoms of his illness. Also noteworthy is the evidence of defendant feeding Richard ice at the hospital when no feeding had been ordered. At that time, his condition had been improving; however, from then on, he deteriorated and died several hours later. Finally, there is no dispute that he died of arsenic poisoning. The remaining evidence is also directed at proving the crime charged."
[2] C.C. Art. 12:

"Whatever is done in contravention of a prohibitory law, is void, although the nullity be not formally directed."
[3] C.C. Art. 1881:

"Engagements made through error, violence, fraud or menace, are not absolutely null, but are voidable by the parties, who have contracted under the influence of such error, fraud, violence or menace, or by the representatives of such parties."
[4] C.C. Art. 1847(7):

"Art. 1847. Fraud, as applied to contracts, is the cause of an error bearing on a material part of the contract, created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other. From which definition are drawn the following rules:
* * * * * *
"7. The artifice must be designed to obtain either an unjust advantage to the party for whose benefit the artifice is carried on, or a loss or inconvenience to him against whom it is practiced, although attended with advantage to no one."